## 9202.  SOUTHERN RAILWAY COMPANY v. SMITH.

1. There was no proof that the engine alleged to have communicated the fire which injured the peach orchard of the plaintiff, adjacent to the railroad right of way, was actually emitting sparks at the time it passed the property, or that it caused the fire; and while there was proof that the engine was equipped with a spark-arrester which was inspected and found to be in good condition the day before and the day after the fire, there was no evidence that the engine was equipped with the best appliance of this character in general use, the use of which was consistent with its practicable operation, or that the spark-arrester was of an approved or standard type or kind. "The measure of diligence which the law places upon a railroad company, in respect to the providing and keeping in repair of spark-arresters or other appliances for the prevention of fire, is to use ordinary care and diligence to apply to its engines the best appliances in general use, the use of which is consistent with the practicable operation of its engines, and to use reasonable care and skill in keeping the same in good order." *Southern Ry. Co.* v. *Thompson*, 129 *Ga.* 367 (7) (58 S. E. 1044). See *Wrightsville & Tennille R. Co.* v. *Mullis*, 11 *Ga. App.* 482 (75 S. E. 825); *Western & Atlantic R. Co.* v. *Mallard*, 139 *Ga.* 407 (3) (77 S. E. 399). Nothing herein ruled conflicts with the decision in the case of *Seaboard Air-Line Ry.* v. *Jarrell*, 145 *Ga.* 688 (89 S. E. 718), in which case there was evidence "to show that the two engines which passed on the day of the fire and prior thereto were properly equipped with *approved* [italics ours] spark-arresters, which evidence was uncontradicted." The circumstances in proof as to the condition of the right of way, the time when the fire occurred, etc., were therefore sufficient to authorize the conclusion that the defendant was negligent as alleged, and to support a recovery.

2. There is no merit in any of the special grounds of the motion for a new trial. The evidence authorized the verdict, and the trial judge did not err in overruling the motion for a new trial.

DECIDED MARCH 12, 1918.

Action for damages; from Paulding superior court—Judge Bartlett. July 21, 1917.

*A. J. Camp, Maddox, McCamy & Shumate,* for plaintiff in error.

*W. E. Spinks,* contra.

WADE, C. J. To make clear the ruling in the first headnote above, the entire evidence offered by the defendant *as to the spark-arrester* with which its engine was equipped is presented. The engineer in charge of the locomotive which the plaintiff contended communicated the fire to his orchard, testified on this subject as follows: "I didn't examine my spark-arrester that day. . . So far as the spark-arrester is concerned, I don't ever look at it. I couldn't tell what kind of a spark-arrester was on my engine.

I assume it had one on it, from the fact that the regulations of the company require it. . . I know my engine had a good spark-arrester, because she didn't throw fire. I know it didn't throw fire so far as I saw; she .was within the standard. They all do throw more or less sparks with the best arresters you can put on them. It is a matter of impossibility to so equip an engine that it will pull a full load and not emit more or less sparks and coals, but the sizes they throw are not considered dangerous." It will be observed that this witness testified that he had no knowledge as to the kind of spark-arrester his engine was equipped with, but merely assumed the engine was in fact provided with a spark-arrester, and that it was "a good spark-arrester," because, so far as he observed, the locomotive "didn't throw fire." It is true he stated that "she [referring to the spark-arrester] was within the standard," but from his other testimony it is obvious that this statement embodied merely a conclusion of the witness based upon the fact that he saw no sparks emitted by his engine. At all events, there was no positive testimony by him that his engine was properly equipped with an "approved" spark-arrester (*Seaboard Air-Line Ry.* v. *Jarrell,* supra), or that the spark-arrester actually in use was one of the "best appliances in general use," the use of which was consistent with its practicable operation. *Southern Ry. Co.* v. *Thompson,* supra.

The fireman who at the time in question was in charge of the engine testified: "The spark-arresting apparatus on the engine was in good condition, so far as I know. I never saw the spark-arrester itself. . . From the condition of the smoke I saw coming out, I would say that the spark-arrester was in good condition. . . I have seen a spark-arrester. I remember seeing it on this engine several times." In this testimony there is nothing to the effect that the spark-arrester on the engine alleged to have communicated the fire was an appliance of the best kind in general use or was even such an appliance as was customarily employed on locomotive engines.

The only other witness who testified as to the spark-arrester on the engine in question was the inspector for the defendant company, whose evidence was as follows: "I am a spark-arrester and ash-pan inspector for the Southern Railroad. I have the inspection of the engine on which Mr. Simmons was running on the

19th of November, 1912. That [indicating] is the second record I made. I am stationed at Inman Yards, Atlanta, Georgia. The inspection was made on the night of the 17th or 18th. Let me see, it was on the morning of the 18th. I inspected it again on the morning of the 20th. She arrived in Atlanta on the night of the 19th. I inspected it when it went off and after it came back. I took the front of it open and looked inside of it to see about the block sheet and table sheet and draft sheet and petticoat pipe. The netting was all right. I made a close examination of the spark-arrester both times. There was no trouble with it at all. In an engine, when the smoke comes from the boiler flues with the particles of coal, it is driven against the first sheet; if any coals come through, it strikes that and bursts them up. Then they hit another sheet, the draft sheet; that breaks them still further. They hit two sheets and then go to the top of the boiler and through the net. When they hit the sheets they are ground up in there. Assuming that the apparatus is in good condition when the particles come out of the smoke-stack, they are something like grains of sand, or dust, something like that. I don't think these things will ignite anything after they pass out at the top and pass through the air. They are not hot enough to start a fire; they may be, but I don't think they are. I made an examination of the spark-arrester on the 18th and on the 20th, and found it in good condition." An analysis of this testimony will disclose that the witness nowhere stated anything in regard to the *type* or *kind* of spark-arrester used on the particular engine at the time of the fire. It is true he said he inspected this engine before and after the day of the fire "and found it in good condition," and also that "there was no trouble with it at all." He likewise testified how smoke coming from boiler flues with particles of coal in it would be driven against different sheets in a spark-arrester, and how the passage of large particles that would start a fire would be prevented where the apparatus was in good condition, but this testimony was merely an abstract explanation of how a spark-arrester of proper type would prevent the emission of dangerous cinders or sparks. The witness did *not* testify that the spark-arrester with which the particular engine was equipped would act in this manner, or that it was itself a good spark-arrester, sufficient to prevent the passage of dangerous cinders or sparks,

and altogether failed to assert that it was the best appliance in ordinary use which could be practicably employed on such an engine, or that it was even of a customary type or of a kind in general use. Although he explained the action of a good spark-arrester when in proper condition, and testified that the spark-arrester and ash-pan on this particular locomotive were in good condition, he did not testify that the particular appliance employed was itself the best appliance of the kind in general use, or even that it would, if in perfect condition, as efficiently prevent the emission of dangerous sparks and cinders as would a spark-arrester in "general use." In fact, none of the testimony in the case showed that the spark-arrester attached to the particular engine was an approved spark-arrester, or was the best appliance of the kind in general use. It can not be said, therefore, as a matter of law, that the presumption created by the unexplained presence of the fire very soon after the passage of the engine coupled with the various circumstances which made it reasonable to infer that the fire was communicated by the passing train, was successfully rebutted, and the finding of the jury to the contrary was not unauthorized. The following quotation from *Southern Railway Co.* v. *Herrington,* 128 *Ga.* 440 (57 S. E. 695), appears to be in point: "The evidence relied upon to establish the fact that the fire was communicated to the land of plaintiff by a spark thrown from a locomotive of the defendant was entirely circumstantial. It appears, from the evidence, that two engines of the defendant had passed near the land, and in a very short time thereafter the fire originated about fifty feet from where the engines passed. There is nothing in the evidence to indicate that the fire could have originated from any other source. This was sufficient to authorize a finding that the fire originated from a spark emitted from a locomotive. This fact being established, a presumption of negligence arose against the company; and the controlling question is whether this presumption was rebutted. The presumption could have been rebutted by the defendant showing that the engines *were properly equipped* [italics ours] and properly handled." See, in this connection, *Southern Ry. Co.* v. *Pace,* 114 *Ga.* 712 (40 S. E. 723) ; *Southern Ry. Co.* v. *Horine,* 115 *Ga.* 664 (42 S. E. 52) ; *Alabama Midland Ry. Co.* v. *Swindell,* 117 *Ga.* 883 (45 S. E. 264).

*Judgment affirmed. Jenkins and Luke, JJ., concur.*